UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| NORI EVANS, an individual, | Case No. 2:15-cv-01136-MMD-CWH |
| Plaintiff, | |
| v. | ORDER |
| UNIVERSITY MEDICAL CENTER a.k.a. UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA a.k.a. UMC, a political subdivision of Nevada; DOES I-V; ROES VI-X, | |
| Defendants. | |

I.     **SUMMARY**

Pending before the Court is Defendant University Medical Center of Southern Nevada's ("UMC" or "Defendant") Motion for Summary Judgment ("Motion") (ECF No. 54). Plaintiff Nori Evans filed a response (ECF No. 64[1]), and UMC filed a reply (ECF No. 74). The Court construes Defendant's Motion as a partial motion for summary judgment because it does not address Plaintiff's apparent claims of a hostile work environment under Title VII and NRS § 613.330.

For the reasons discussed herein, the Motion is granted.

II.    **BACKGROUND**

This action relates to Plaintiff's employment with and employment termination by UMC. On March 30, 1998, Evans began working at UMC in Las Vegas, Nevada.(ECF No. 1 at ¶ 6.) On September 30, 2014, Evans was terminated from her position at UMC

_____

[1]Additional exhibits to Plaintiff's response were filed separately. (ECF Nos. 66, 71.)

as a Respiratory Services Supervisor ("RS Supervisor") in the Respiratory Services Department ("RS Department" or "the Department") at UMC. (*Id.* at ¶ 25; ECF No. 54 at 7.)

Before Plaintiff's employment termination, the Department was structured to include the following positions: (1) Director Alicia Jones; (2) RS Managers; (3) RS Supervisors, such as Plaintiff; (4) Respiratory Care Coordinators; (5) Advanced Respiratory Care Practitioners ("ARCP"); (6) full-time Respiratory Therapists; and (7) temporary or per diem Respiratory Therapists. (ECF No. 54 at 4-5.) The Department also included one administrative assistant, Leslie Hill. (*Id.* at 5.)

During her employment, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on June 24, 2009. (ECF No. 1 at ¶ 15.) After receiving a Right to Sue letter in that action, she filed suit against UMC ("First UMC Lawsuit" or "First Lawsuit") for race-based discrimination and retaliation under Title VII, and for violation of the Equal Pay Act. (*Id.*) The parties jointly dismissed that action with prejudice in February 2013.[2] Plaintiff alleges in this action that UMC continued to discriminate against her based on her race after the First UMC Lawsuit and that UMC retaliated against her for the First Lawsuit by failing to promote her around May 2014 and by ultimately terminating her from her position as a nightshift RS Supervisor in September 2014. At all relevant times, Alicia Jones was the Director of Respiratory Services in the Department at UMC.

As to Plaintiff's failure to promote allegations, around May 2014, Daniel Dietchler was given the positon of Respiratory Manager. (ECF No. 1 at ¶ 17.) Plaintiff did not apply for the position, but she contends Dietchler was less qualified for the position, as she had twelve years of experience as an RS Supervisor by that time. (*Id.*) As to Plaintiff's wrongful termination contentions, there were two RS Supervisor positions eliminated, including Plaintiff's position, as part of a UMC-wide reduction in costs in September 2014. (*Id.* at

---

[2] *See Evans v. Univ. Medical Ctr.*, 2:11-cv-00449-RCJ-VCF (ECF No. 25) (February 25, 2013).

¶¶ 24, 30.) Claire Wiedmann and Tracy Sutter occupied the two dayshift RS Supervisor positions but had left these positions eight months and eighteen months earlier— Wiedmann in January 2014 and Sutter in March 2013. (*See* ECF No. 64-6 at 5.) The two dayshift RS Supervisor positions were never refilled. (ECF No. 64 at 19; ECF No. 66-3 at 9; *see* ECF No. 74 at 16 ("[t]hat two of the positions were not filled at the time of the [budget] cut does not change the fact that the department could and would have to operate without four supervisor positions").) Along with Plaintiff, Mark Ambatali was terminated as a nightshift RS Supervisor in September 2014. (ECF No. 1 at ¶ 30.) Defendant admits that, to comply with the UMC-wide directive to cut costs, Director Jones recommended to UMC executive management certain equipment expense cuts, elimination of several per diem positions, and elimination of the entire supervisor level in the RS Department. (ECF No. 54 at 7.)

Plaintiff brings seven claims for relief in her complaint:[3]

(1) discrimination based on race in violation of Title VII, 42 U.S.C. § 2000e-2, by (a) eliminating all minority RS Supervisors while similarly situated Caucasian employees who were less qualified were neither eliminated nor terminated and (b) subjecting Plaintiff to a racially hostile working environment when Defendant supervised Plaintiff and other African American employees under more stringent standards and when a certain individual would make race-based comments regarding Plaintiff or "the Black issue";[4]

(2) unlawful retaliation under Title VII, 42 U.S.C. § 2000e-3, by failing to promote Plaintiff and giving the Respiratory Manager position to a Caucasian candidate less qualified than Plaintiff because Plaintiff complained of impermissible racial workplace discrimination;

(3) unlawful retaliation under Title VII, 42 U.S.C. § 2000e-3, by terminating Plaintiff for complaining of impermissible racial workplace discrimination, by eliminating her position, and by terminating all minority supervisory staff in the Department;

///

[3]Plaintiff asserts an eighth claim for intentional infliction of emotional distress, however, this claim is asserted against the two individual defendants who have been dismissed pursuant to the parties' stipulations. (ECF Nos. 32, 33.)

[4]The Court construes this claim as one for a hostile work environment based on race; the first part of the claim—under (a)—is merely circumstantial evidence of a hostile work environment resulting from race-based discrimination. Defendant's Motion does not address Plaintiff's hostile work environment claim, which is why the Court construes Defendant's Motion as seeking partial summary judgment. It is worth noting that Plaintiff fails to point out that she is also alleging any hostile work environment claims.

(4) violation of Plaintiff's rights to make and enforce a contract for employment under 42 U.S.C. § 1981 when UMC (a) failed to promote Plaintiff to a managerial position, which was given to a lesser qualified candidate not of Plaintiff's protected class, and (b) terminated Plaintiff in retaliation for the First UMC Lawsuit and for Plaintiff's complaints of impermissible discrimination based on race in the workplace;

(5) discrimination based on race in violation of NRS § 613.330 by eliminating all minority RS Supervisors and by subjecting Plaintiff to a racially hostile working environment;[5]

(6) unlawful retaliation because of race in violation of NRS § 613.330 by failing to promote Plaintiff; and

(7) unlawful retaliation because of race in violation of NRS § 613.330 by terminating Plaintiff.[6]

(ECF No. 1 at 8-12.)

## III.   LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (internal citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin*

---

[5]The Court also construes this claim as one for a hostile work environment. *See supra* n.4.

[6]Plaintiff also appears to either assert claims of retaliation and termination on the basis of race on behalf of other "minority supervisory staff in the Respiratory Service Department" or contend that she was somehow retaliated against when these other individuals were terminated. (*See* ECF No. 1 at ¶¶ 61, 67, 77.)

4

*Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000) (internal citation omitted). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, *NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," *Anderson*, 477 U.S. at 252, and a "trial court can only consider admissible evidence in ruling on a motion for summary judgment," *Orr*, 285 F.3d at 773. A court can consider evidence when ruling on a motion for summary judgment that is presented in an inadmissible form so long as the underlying facts may be presented in an admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

///

///

///

## IV.    EVIDENTIARY ISSUES

### A.    Authentication

"Authentication is a condition precedent to admissibility," and unauthenticated documents cannot be considered by a court when ruling on a motion for summary judgment. *Orr*, 285 F.3d at 773. "[D]ocuments authenticated through personal knowledge must be attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Id.* at 773-74. However, a foundation for authenticity may be established by any manner permitted under Fed. R. Evid. 901(b) and 902. *See id.* at 774. Here, all of the exhibits attached to Defendant's Motion and certain of Plaintiff's exhibits are not properly authenticated. However, because Plaintiff has authenticated certain documents, specifically deposition testimony, that Defendant provides unauthenticated portions of, this is sufficient to satisfy authentication of the documents for both parties. *See id.* at 776. The Court therefore will not consider those documents that neither party has authenticated as specified below.[7]

### B.    Extracts of Deposition Testimony

Both parties produced deposition testimony of various witnesses. "A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr*, 285 F.3d at 774 (citing Fed. R. Evid. 901(b), Fed R. Civ. P. 56(e) & 30(f)(1)). Moreover, it is "insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a true and correct copy." *Id.* (internal quotation marks omitted).

For each extract of deposition testimony provided by Plaintiff, she produced a page identifying the name of the deponent and action, as well as the reporter's certification. Defendant, however, failed to provide the reporter's certification for any of the extracts of

---

[7]The Court did not need to look at the exhibits attached to Defendant's reply (ECF No. 74); therefore, it does not consider the authenticity of those documents.

deposition testimony that it attached to its motion. But because Defendant submitted portions of deposition testimony that have been authenticated by Plaintiff, the Court finds that only selected portions of Defendant's submitted extracts are unauthenticated and therefore inadmissible. Specifically:

- Exhibit A, pages 146-49 of Plaintiff's deposition testimony taken on March 2, 2017 (ECF No. 54-1 at 7);
- Exhibit A, pages 199-202, 271-74, and 279-82 of Plaintiff's deposition testimony taken on March 15, 2017 (ECF No. 54-1 at 9, 14-15);
- Exhibit B, pages 41-44, 53-56, 89-92, 125-28, and 145-48 of Alicia Jones' deposition testimony taken on March 20, 2017 (ECF No. 54-2 at 5, 7-8, 10-11);
- Exhibit D, pages 21-24 of Tracy Sutter's deposition testimony taken on March 31, 2017 (ECF No. 54-4 at 3); and
- Exhibit H, pages 22-25 of Patricia Bain's deposition testimony taken on April 20, 2017 (ECF No. 54-8 at 3).

The Court will therefore not consider the portions of Defendant's exhibits (i.e., deposition testimony) that have not been authenticated in ruling on Defendant's Motion.

### C. Emails

A printout of an e-mail may be authenticated through "affidavits from the actual authors laying the foundation that the emails are what they purport to be" or through a party's identification of the document as being produced by the parties in discovery. *See In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) (citing *Orr*, 285 F.3d at 777, 777 n.20). Plaintiff provided various printouts of emails but failed to provide an affidavit from the email's authors identifying them as such, by providing an affidavit identifying the documents as produced during the course of discovery, or by even

///

///

///

stating in the body of Plaintiff's opposition that the emails were produced by the parties during the course of discovery.[8] These include the following of Plaintiff's exhibits:

- Exhibit 2 (ECF No. 64-2);
- Exhibit 3 (ECF No. 64-3);
- Portions of Exhibit 22 (ECF No. 71-1 at 6-9[9]).

The Court finds that these documents are unauthenticated, and therefore inadmissible, and will not consider them in ruling on Defendant's Motion.

### D.   Other Documents

The parties produced three documents—Defendant's Exhibit C and Plaintiff's Exhibits 1,[10] 4, and a portion of 22—that appear to be related to the RS Department but that are not properly authenticated. Specifically, these documents are what appear to be an expense reduction tracking chart,[11] a printout of employment classifications for Wiedmann and Sutter, and a chart listing information about employees. (ECF Nos. 54-3, 64-1, 64-4; ECF No. 71-1 at 2-5.) To the extent these documents may have been produced during the course of discovery, neither party met its burden in order for the Court to properly authenticate them. *See Orr*, 285 F.3d at 777 (stating that to provide adequate foundation for documents produced in discovery an affidavit must be produced stating who wrote/created the document and who produced it during discovery from someone who has personal knowledge of these things*); see also In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d at 781 (deeming documents authentic because the plaintiff had identified the documents as being produced by the parties in discovery).

---

[8]The Court notes that these documents include what appear to be bates numbers in the bottom right hand corner of each page. The Court finds this is insufficient for purposes of authentication in connection with summary judgment proceedings. *See Orr*, 285 F.3d at 777.

[9]There is a chart attached to an email that the Court construes as part of the email itself.

[10]Defendant's Exhibit C and Plaintiff's Exhibit 1 are the same document.

[11]While the Court does not find this exhibit to be admissible, it takes as undisputed that Jones made a recommendation to UMC executive management regarding budget cuts in the RS Department and that this recommendation included Plaintiff's position. (*See* ECF No. 54 at 7; *see also* ECF No. 64 at 9.)

1 These documents are therefore inadmissible and will not be considered in ruling on
2 Defendant's Motion.

3 **V.    DISCUSSION**

4        In UMC's Motion, it generally argues that Plaintiff cannot "provide facts sufficient
5 to establish the existence of elements essential to her claims" or "meet her burden to
6 state a prima facie case as to all her claims against [UMC]." (ECF No. 54 at 3.) UMC also
7 contends that even if Plaintiff were able to meet her burden to state a *prima facie* case of
8 employment discrimination or retaliation, UMC has proffered a legitimate, non-
9 discriminatory reason for its action—i.e., the hospital-wide reduction in costs. (*Id.*)
10 Plaintiff's response points to what she considers to be direct and circumstantial evidence
11 to meet her burden for both her race-based discrimination and retaliation claims. (ECF
12 No. 64 at 5-21.) The Court agrees with Defendant and finds Plaintiff has failed to meet
13 her burden in defeating summary judgment.

14        **A.    Title VII, Section 1981, and NRS 613.330[12] Discrimination Claims**

15        UMC argues that because Plaintiff cannot produce any direct evidence of racial
16 animus or direct evidence that demonstrates pretext, the analysis must proceed under
17 the *McDonnell Douglas* framework. (ECF No. 54 at 7-8.) Defendant also contends that
18 because Plaintiff did not apply for the position for which she was not selected "in or around
19 May 2014" (*see* ECF No. 1 at ¶ 17), this is fatal to her race-based discrimination claims
20 based on failure to promote. In response, Plaintiff states that she has established racially
21 discriminatory intent as to her termination through both direct and circumstantial
22 evidence. (ECF No. 64 at 2.) Plaintiff does not address the failure-to-promote basis for
23 ///
24 ///
25 ///

---

26        [12]The Court considers the NRS § 613.330 claims under the same framework as
27 Title VII claims. *See Pope v. Motel 6*, 114 P.3d 277, 280 (Nev. 2005) ("In light of the
   similarity between Title VII of the 1964 Civil Rights Act and Nevada's anti-discrimination
28 statutes, we have previously looked to the federal courts for guidance in discrimination
   cases.")

her race-based discrimination claims.[13] Therefore, the Court addresses only the termination of Plaintiff as the adverse employment action in support of Plaintiff's discrimination claims.[14]

### 1.    Relevant Legal Standards

While Plaintiff presents what she considers to be "direct evidence" of racial animus as the basis for her employment termination (*see* ECF No. 64 at 6-9), none of this evidence is actually direct—rather, it is circumstantial. Therefore, the Court proceeds under the burden-shifting framework in Title VII cases.

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), the Supreme Court set forth a proof-of-employment-discrimination framework "with two distinct components: (1) how a plaintiff may establish a prima facie case of discrimination absent direct evidence, and (2) a burden-shifting regime once the prima facie case has been established." *Noyes v. Kelly Serv.*, 488 F.3d 1163, 1168 (9th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802-804). The framework established a three-part test. First, a plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011) (citing *Noyes*, 488 F.3d at 1168). Once the plaintiff makes this initial showing, the burden

---

[13]Plaintiff identifies the hiring of Daniel Dietchler as an RS Manager over Plaintiff as circumstantial evidence in support of her *prima facie* case of discrimination, but she does not argue that his hiring over her was an adverse employment action. Therefore, despite the complaint's contention that Dietchler's hiring was an adverse employment action, Plaintiff fails to make any arguments on that basis, and the Court considers the failure-to-promote basis for Plaintiff's race-based discrimination claims waived.

Moreover, because Plaintiff did not apply to the position for which Dietchler was hired, she is unable to bring a claim for intentional discrimination based on failure to promote. *See McDonnell Douglas*, 411 U.S. at 802. Similarly, Plaintiff identifies the hiring of Jones to the Respiratory Director position over Plaintiff as direct evidence in support of her *prima facie* case. (ECF No. 64 at 6-7.) However, it is unclear how this is direct evidence of race-based discrimination, and the failure to promote Plaintiff to the Respiratory Director position occurred outside the scope of the Complaint as well as the statute of limitations period of the EEOC charge for which this case is based.

[14]Defendant's Motion also addresses Plaintiff's allegation that another employee receiving preferential treatment in training was an adverse employment action. (*See* ECF No. 54 at 12.) However, Plaintiff does not address this in her opposition nor is it identified in her EEOC/NERC charge. Therefore, the Court does not consider any failure-to-train basis for Plaintiff's race-based discrimination claims.

then shifts to the defendant to articulate a facially legitimate, non-discriminatory reason for the adverse employment actions that impacted the plaintiff. *Id*. If the defendant articulates a legitimate reason, the burden then shifts back to the plaintiff to demonstrate there is a triable issue of fact that the defendant's proffered reason is not applicable to the plaintiff and is a mere pretext for unlawful discrimination. *Id*. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

## 2. *Prima Facie* Case

To make out a *prima facie* case of discrimination, a plaintiff must provide evidence that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action, such as termination; and (4) similarly situated individuals outside her protected class were treated more favorably. *See Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003). Where, as here, the adverse employment action of termination[15] results from a general reduction in workforce, the plaintiff does not need to show that she was actually replaced but may show through circumstantial or direct evidence that her termination "occurred under circumstances giving rise to an inference of [race-based] discrimination." *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). "At summary judgment, the degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (internal quotation marks omitted).

Both Defendant and Plaintiff agree that the first three factors of the *prima facie* case have been met but disagree as to whether any evidence can establish the fourth factor. Because Plaintiff presents the same evidence in support of the fourth factor of the

///

---

[15]Plaintiff does not argue in her opposition that any other actions constituted adverse employment acts for purposes of her race-based discrimination claims.

*prima facie* case and in support of pretext, the Court assumes Plaintiff has established the fourth factor and analyzes the proffered evidence under the standard for pretext.

### 3. Legitimate, Non-Discriminatory Reason for Termination

In its Motion, Defendant states that Plaintiff's termination was based on a supposed five percent reduction directive issued by UMC's CEO in or around August 2014. (ECF No. 54 at 5.) Defendant states that in the Department, the reductions included: "(1) both, then-vacant, day-shift RS Supervisor positions and both night-shift RS Supervisor positions occupied by Plaintiff and Ambatali; and (2) several per diem therapists." (*Id.* at 5-6.) The Court finds this reason satisfies Defendant's requirement to show a legitimate, non-retaliatory reason for Plaintiff's termination.

### 4. Pretext

A plaintiff may demonstrate pretext in two ways: "(1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl*, 658 F.3d at 1112-13 (citing *Chuang v. Univ. of Cal. Davis, Bd. Of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000)). "Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." *Id.* at 1113 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

The Court finds Plaintiff has failed to show through specific and substantial evidence that UMC's termination of Plaintiff was more likely than not the result of unlawful discrimination or that Defendant's proffered reason for her termination is not worthy of credence or is unbelievable. See *Earl*, 658 F.3d at 1112-13. In fact, the only evidence presented that supports Plaintiff's contention that her termination was based on her race is Defendant's admission that it removed three black employees including Plaintiff and a minority employee,[16] all of whom were in supervisory roles in the RS Department, in the

---

[16]Specifically, Mark Ambatali, who is described as Filipino. (*See, e.g.*, ECF No. 66-2 at 16.)

ten-month period prior to Plaintiff's termination. (*See* ECF No. 64-6 at 6.[17]) However, the evidence cited to by Plaintiff demonstrates that Marla Pitts and Allen Booker, who Plaintiff contends are the two other black employees "terminated" from supervisory positions during the noted ten-month period, were hired on a probationary basis. (*See* ECF No. 66-5 at 13 (Alicia Jones stating in her deposition that two black employees in supervisory roles during the ten-month period were released from probation).) Plaintiff provides evidence that Booker was released from probation as a RS Manager on the nightshift because he lacked experience and because a woman, ostensibly a patient, had complained about him. (*See* ECF No. 66 at 11-12, 19.) Moreover, Booker believed that his release from probation was not on the basis of race. (*See id.* at 14.) Plaintiff also provides evidence that Marla Pitts was released from probation as an RS Supervisor on the nightshift because she was not the "right fit" for the position and there were complaints that Pitts did not complete her assignments. (*See* ECF No. 66-2 at 4-5, 18.) Similar to Booker, Pitts appears not to have "blame[d] [her] race" for not being kept on as an RS Supervisor. (*See id.* at 12.)

In her opposition, Plaintiff identifies other evidence purporting to show that her termination was based on her race—specifically, she identifies a "hit list", hiring decisions based on race, what is referred to as "the black issue," disproportionate scrutiny of staff working under the supervision of Plaintiff, and a racially hostile work environment. However, Plaintiff's cited evidence is neither specific nor substantial enough to show that Defendant's proffered reason for her termination is more likely than not motivated by race, is not worthy of credence, or is unbelievable. First, to the extent Plaintiff alleges that Jones had a hit list, there is no admissible evidence presented that the list was racially based or

///

///

_____

[17]While Defendant denied that "in the 10 month period prior to [Defendant's] termination of Plaintiff, Defendant [ ] eliminated or terminated *all* minorities in management positions in the Department and hired an African American Supervisor and an African American manager to work the night shift" (ECF No. 64-6 at 5 (emphasis added)), it is unclear what portion of that statement Defendant actually denied.

that Plaintiff's name was on it.[18] (*See, e.g.*, ECF No. 66-2 at 16, 19 (Pitts testified that she had never seen a list but rumor had it there was a list and there was no commonality to the list because it included white and black individuals).) Second, the contention that the RS Department hired employees based on race actually weighs against Plaintiff's contention that her termination was based on race, as hiring individuals of different races tends to demonstrate inclusivity and the value of diversity. Third, the evidence presented by Plaintiff regarding "the black issue" when considered in context clarifies that the term referred to a specific dispute between a white employee, Jorie Matijvich, and a black employee, Beverly Watkins, and mitigating any racial hostility between those two specific individuals, not to Plaintiff or a basis for her termination. (*See* ECF No. 66 at 6-7.) Fourth, as to Plaintiff's contention that the staff she supervised on the nightshift were disproportionately scrutinized, the evidence she cites to identifies only one employee with any particularity—Beverly Watkins—who worked under Plaintiff's supervision on the nightshift and who was scrutinized more than others. (*See* ECF No. 66-3 at 16-18; ECF No. 66-9 at 7-8.) Plaintiff makes the bold conclusion that because various witnesses testified to what appear to be differing versions of how chart audits occurred, this permits a "reasonable inference" that there was corruption in the auditing process,[19] which then somehow allows the Court to make the subsequent inference that Plaintiff's termination was based on her race. (*See* ECF No. 64 at 11.) However, the Court would have to make several assumptions to reach this ultimate conclusion.

[18]Plaintiff cites to her own deposition testimony to support her contention that her name was on the list. (*See* ECF No. 64 at 20). However, Plaintiff's deposition testimony only supports her hearing from Leslie Hill that a list existed (*see* ECF No. 66-3 at 9). To the extent Plaintiff relies on the deposition testimony of Leslie Hill for the existence of Jones' "hit list" and the content of that list, Hill's testimony includes: Jones made comments not directly to Hill but while in the office about hiring a new black manager to "take care" of Plaintiff; Jones never told Hill directly that she had a "hit list"; Jones "might have" said Plaintiff was on Jones' list "one time"; and that people were placed on this supposed list when they "had done something wrong that day." (*See* ECF No. 66-1 at 4.) To the extent Hill's testimony is admissible, there is still no support that the list was based on race.

[19]Plaintiff admitted that RS Supervisors made the decision about who to audit and how often to audit them. (ECF No. 66-3 at 15.) Therefore, it is unclear who made the decision to audit Watkins or anyone else working under Plaintiff.

And finally, as to Plaintiff's contention that the RS Department was racially hostile, she cites to evidence that is not probative of racial discrimination as the basis for her termination or that fails to support the propositions she asserts. For example, Plaintiff points to supposed behaviors of Wiedmann as being demonstrative of racial hostility; however, the fact that Wiedmann supposedly yelled at employees[20] or dried her hands on Plaintiff's sweater does not indicate that these actions were racially motivated or were taken because of Plaintiff's race. (ECF No. 64 at 11.) Plaintiff also points out that "Jones' secretary warned at least two African American employees regarding Jones and Respiratory management" (*see id.*), but one of the employees believed the warning referred to "things [being done] exactly the way that [Jones] wanted" (*see* ECF No. 66 at 12) and the other explained that the secretary provided a vague warning to "go to the EEOC"[21] without any further details (*see* ECF No. 66-9 at 9-10). Receiving vague warnings from a fellow employee or warnings indicating that a superior may be nitpicky about a new employee's job performance does not give rise to a reasonable inference that Plaintiff's work environment was racially hostile, even if these warnings were given to employees who are black. Similarly, Plaintiff states that "soon after April 2013, an African American employee complained that Jones, Wiedmann, and other supervisory staff were discriminating against her." (ECF No. 64 at 11.) However, the evidence she cites to indicates that the African American employee made complaints about race and age discrimination *to* (not about) Jones, Wiedmann, and other supervisory staff, specifically with regards to auditing. (*See* ECF No. 66-9 at 11-12.) While the employee's complaints may have been legitimate, there is no indication the complaints were about a persistent pattern of racial hostility or if these complaints instead concerned isolated

---

[20]The evidence cited to only indicates that on one occasion Wiedmann exhibited disruptive behavior in the neonatal intensive care unit and on another occasion she created unnecessary "drama." (*See* ECF No. 66-5 at 14-15.) Furthermore, there is no indication these behaviors were directed at black employees or any other employees based on their race.

[21]This testimony is inadmissible hearsay—Hill even stated in her deposition that she never told Watkins to file a complaint with the EEOC. (*See* ECF No. 66-1 at 5.)

1 instances. Thus, none of these examples in support of a hostile work environment, even
2 if considered together, permit the Court to find that a reasonable jury could find that
3 Plaintiff was terminated because of her race.

4 The Court therefore finds that Plaintiff has failed to meet her burden as to pretext
5 and grants summary judgment in favor of Defendant on Plaintiff's race discrimination
6 claims.

### B.    Title VII, Section 1981,[22] and NRS § 613.330 Retaliation Claims

8 Defendant argues that the lack of temporal proximity between the First Lawsuit
9 and her termination is legally fatal to her claims of retaliation.[23] Plaintiff responds that the
10 last protected activity she engaged in was making complaints about race-based audits
11 and that there was a valid reason for the delay, specifically that "[e]veryone knew [Plaintiff]
12 was 'untouchable' for a period of time after her prior claim" and that in order to get away
13 with firing Plaintiff, Director Jones had to wait until she saw an opportunity. (ECF No. 64
14 at 15, 17.) Plaintiff also states that because there was ongoing harassment of and a
15 pattern of antagonism against her, this establishes a causal link, even with the lack of
16 temporal proximity. The Court, however, finds that Plaintiff has failed to meet her burden
17 in opposing summary judgment on the retaliation claims.

### 1.    *Prima Facie* Case of Retaliation

19 To prevail on a retaliation claim, a plaintiff must first establish a *prima facie* case
20 of retaliation by demonstrating: (1) she engaged in a protected activity; (2) she suffered
21 an adverse employment action; and (3) there is a causal link between the protected
22 activity and the adverse employment action. *See Dawson v. Entek*, 630 F.3d 928, 936
23 (9th Cir. 2011). "Title VII retaliation claims require proof that the desire to retaliate was
24 the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v.*
25 *Nassar*, 570 U.S. 338, 352 (2013). "[C]ases that accept mere temporal proximity between

26 [22]Section 1981 encompasses employment-related retaliation claims. *See CBOCS*
27 *West, Inc. v. Humphries*, 553 U.S. 442, 445, 455 (2008).

28 [23]Once again, Plaintiff does not address the failure to promote as an adverse
employment action resulting from retaliation.

an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be very close." *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted) (citing to cases where three and four month periods are insufficient to establish causality). However, the court must consider the totality of the facts when determining whether the plaintiff has established a causal link and may not base its decision solely on the length of time between the protected activity and the adverse employment action. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).

As to the first element of the *prima facie* case of retaliation, Plaintiff identifies settlement of the First Lawsuit and a complaint about race discrimination as the protected activities that she engaged in.[24] (ECF No. 64 at 15.) As to the February 2013 settlement of the First Lawsuit, both parties aver that the settlement itself was a protected activity. However, the actual settlement of an EEOC-initiated lawsuit is not a "protected activity." *See Miller v. Fairchild Indus., Inc.*, 797, F.2d 727, 729 (9th Cir. 1986) (clearly stating that the protected activity is the filing of the EEOC discrimination charges not the settlement of those charges); *see also Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 850 (9th Cir. 2004) (indicating that the plaintiff engaged in protected activities up to the date of the settlement but not identifying the settlement of the EEOC claims as the protected activity); *see also Stucky v. Dep't of Educ.*, 283 F. App'x 503, 505 (9th Cir. 2008) (finding that initiation of a Title VII lawsuit may be a protected activity). The Court therefore finds that

///

---

[24]While Plaintiff states that her complaints in early 2014 to Jones regarding the "disproportionate auditing of African American employees' charts" qualifies as protected activity, the evidence she cites in support of her making such a complaint relates to the elimination of the RS Supervisor position. (*See* ECF No. 63 at 15 (citing to ECF No. 66-3 at 10).) However, in Plaintiff's deposition testimony, she was asked if she had brought up her concern to Jones in either late 2013 or early 2014 that audits were disproportionate against African Americans, to which Plaintiff stated "I can't confirm whether it was verbal or a—" and also stated that she could not remember if another person was present. (*See* ECF No. 66-3 at 27.) The Court finds this is sufficient to show Plaintiff engaged in protected activity as late as early 2014.

it is the initiation of the First Lawsuit on March 25, 2011,[25] and the early 2014 complaint to Jones that constitute Plaintiff's last protected activities for which she has provided adequate evidence. Because Plaintiff's termination occurred over three years after initiation of the First Lawsuit and at least six months after her complaint of race-based discrimination, demonstrating the causation element is more difficult for Plaintiff to prove. *See Ghirma v. Nw. Airlines, Inc.*, 131 F. App'x 609, 611 (9th Cir. 2005) (citing to *Breeden*, 532 U.S. at 273) (finding that plaintiff's protected activity of filing lawsuit over three years before his termination made the plaintiff unable to establish a causal link between the protected activity and the adverse employment action even where the settlement of that lawsuit occurred nineteen months before his termination and he engaged in another form of protected activity three months before his termination).

Plaintiff argues that evidence of ongoing harassment, a pattern of antagonism, or a valid reason for delay between the time of the last protected activity and the act of retaliation may establish causation where there is a lack of temporary proximity between the two actions. (*See* ECF No. 64 at 15-17.) Plaintiff, however, cites to no evidence in the record in support of these contentions, and instead avers without pointing to the record for support that: (1) "[d]uring the resolution of [Plaintiff's] prior lawsuit against [Defendant], [Plaintiff] was denied the position of Respiratory Director"; (2) "[Plaintiff] was subject to repetitive demands to perform audits on the Black employees who worked for her"; (3) "[Plaintiff's] complaints about unfair application of audits and reprimands fell on the deaf ears of Jones"; (4) Jones "was not in a position to retaliate until shortly before the retaliation"; (5) "[e]veryone knew that [Plaintiff] was 'untouchable' for a period of time after her prior " settlement; and (6) Jones waited until the layoffs to use them as an opportunity to terminate Plaintiff. (ECF No. 64 at 16-17.) The Court disagrees that these alleged forms of conduct establish a causal link in the absence of a temporal link.

///

---

[25] *See* Complaint, *Evans v. Univ. Medical Ctr.*, 2:11-cv-00449-RCJ-VCF (ECF No. 1) (Mar. 25, 2011).

First, the contention of a "failure to promote" Plaintiff to the position of Respiratory Director is outside the scope of this action,[26] is nonetheless an isolated incident, and does not, in itself, manifest antagonism or harassment. Second, the deposition testimony of Plaintiff (ECF Nos. 66-3, 66-4) does not confirm that Plaintiff was subject to repetitive demands to audit black employees who worked for her; rather, she contends that one black employee in particular, Beverly Watkins, who worked under Plaintiff was scrutinized and audited more than other employees. Third, Plaintiff mentions complaining to Jones only in late 2013 and 2014 about disproportionate auditing of black employees but these actions constitute protected activities, not forms of antagonism or harassment against Plaintiff. Moreover, Jones' supposed failure to address Plaintiff's complaints are not supported by evidence and in themselves do not demonstrate harassment or antagonism of Plaintiff. Finally, the remaining allegations do not support a pattern or ongoing behavior. No admissible evidence has been offered to support that Jones had exclusive authority to terminate Plaintiff or that Plaintiff could not have been terminated at some point prior to the layoffs. To the extent Jones recommended termination of Plaintiff at the time of the layoffs and may, in fact, have desired her termination, Plaintiff has presented no evidence to raise a reasonable inference or triable issue of fact that the recommendation to terminate Plaintiff was on the basis of the First Lawsuit or her complaints of disproportionate auditing of black employees.

Despite Plaintiff's failure to point to specific evidence of ongoing antagonism or a pattern of harassment during the relevant time period by those in a position to retaliate

///

///

///

///

---

[26]This specific failure to promote is not identified in the EEOC charge and appears to be outside the 180-day statute of limitations. (*See* ECF No. 1 at 17.) Moreover, even though a pattern of ongoing retaliation following protected conduct may support a finding of causation, this alleged failure to promote was an isolated incident.

against her,[27] because the causation element is construed broadly, the Court will nevertheless assume the *prima facie* case of retaliation has been established and move onto evaluating whether Plaintiff's termination was pretextual or actually based on a retaliatory motive.[28] *See Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007) ("At the prima facie stage of a retaliation case, the causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (internal quotation marks and alteration omitted).

## 2. Pretext

None of Plaintiff's proffered "direct evidence" of a retaliatory motive is, in fact, direct evidence of UMC having a retaliatory motive when terminating Plaintiff. While Jones may have been aware that Plaintiff had "won" her prior lawsuit and also may have been involved in termination decisions in the RS Department (*see* ECF No. 64 at 17-18), this is not direct evidence that Jones recommended Plaintiff's termination *because* of Plaintiff's protected activity. Moreover, the proffered "direct evidence" that Defendant "is known for retaliating" is not evidence; it is a mere conclusion not supported by specific facts and made by an employee who had no say in the elimination of Plaintiff's position. (*See* ECF No. 64 at 18 (citing ECF No. 66-9 at 9-10).)

///

---

[27]Plaintiff appears to offer the same evidence to establish the third element of the *prima facie* case of retaliation and the third step of the *McDonnell Douglas* framework. Plaintiff's analysis of the retaliation claims is organized into two sections: (1) identifying the elements of the *prima facie* case and attempting to analyze the *prima facie* case (ECF No. 64 at 12-17); and, (2) listing "direct and circumstantial evidence" of "retaliatory motive and pretextual termination" (*id.* at 17-21). Because Plaintiff may have wished to utilize the same evidence to establish the *prima facie* case and to show pretext as required under *McDonnell Douglas*, the Court moves onto the final step of *McDonnell Douglas*'s burden-shifting framework.

[28]To avoid redundancy, the Court omits a reiteration of its prior analysis of the second step of *McDonnell Douglas*—Defendant's burden to articulate a legitimate non-retaliatory reason for its decision. Defendant's basis for Plaintiff's termination is the supposed five-percent reduction in UMC's budget, which the Court recognized as a legitimate, non-discriminatory reason for Plaintiff's termination. *See* discussion *supra* Sec. V(A)(iii).

The Court also finds that Plaintiff's proffered circumstantial evidence, which challenges the credibility of Defendant's motives, fails to meet the specific and substantial requirement so as to raise a genuine issue of material fact. First, to the extent Plaintiff contends that Jones kept Plaintiff in a position from which she could "get rid of Plaintiff" (ECF No. 64 at 18), the Court finds the proffered evidence to be either inadmissible or to not support that proposition.[29] For instance, Plaintiff's contention, based on deposition testimony from Booker, that Jones planned to eliminate the RS Supervisor positions for the nightshift as early as April 2014 (before the layoffs were announced) is not admissible, as it is hearsay that does not fall into any clear exception. To the extent Jones' intent to eliminate the nightshift RS Supervisors may be presented in an admissible form at trial, this intent included both Plaintiff and the other nightshift supervisor, Mark Ambatali, and no evidence has been presented that Ambatali also engaged in protected activity. While this evidence may be subject to more than one interpretation, it is not specific and substantial enough to demonstrate an intent to terminate Plaintiff in retaliation for her earlier protected activities.[30]

Similarly, Plaintiff contends that Sutter, who stepped down from the RS Supervisor dayshift position in March 2013 and became a respiratory care coordinator, and Wiedmann, who stepped down from that same position in January 2014 and became an ARCP, were privy to inside information from Jones about elimination of the RS Supervisor

---

[29]Similarly, the contention that everyone knew Plaintiff was "untouchable" after her settlement is based on an alleged statement made by Wiedmann to Hill and is therefore inadmissible hearsay. (*See* ECF No. 66-1 at 7-8; *see also* ECF No. 71 at 12 (in response to the question of whether she told Hill that Plaintiff was untouchable, Wiedmann stated that she didn't "know anything about [Plaintiff's] settlement" and did not tell Hill the only way UMC could terminate Plaintiff was to eliminate the supervisor position).)

[30]Similarly, to the extent Plaintiff argues there is evidence that Jones had a hit list and that the list "was populated with employees who had previously engaged in protected activity rather than the list being populated specifically with African Americans" (*see* ECF No. 64 at 20), the cited deposition testimony does not support this contention. The testimony makes mention that alleged employees on the list made "inequality complaints" but these appear to have been random and not "complaints protected by Title VII" or related to UMC's alleged discriminatory conduct. (*See, e.g.*, ECF No. 66-2 at 17 (stating that one employee thought she was asked to do a particular duty more so than other employees because she "had FMLA and [ ] was calling out a lot [due to being] sick").)

position. However, Sutter and Wiedmann expressly contradicted this assertion. (*See* ECF No. 66-7 at 7 (Tracy Sutter stating that she did not find out before stepping down and becoming a respiratory care coordinator that the layoffs were to occur and states that she found out after she took a non-supervisor position); *see also* ECF No. 71 at 6-7 (Claire Wiedmann stating she thought that in 2013 the RS Department would be absorbed by the radiology department and that she did not step down from the RS Supervisor position because of any belief the position would be eliminated or she would be terminated).) Moreover, Plaintiff's contention that Jones did not set out to refill the vacancies left by Sutter and Wiedmann may be explained by things other than an intent to eliminate Plaintiff in retaliation for her prior protected activities. Generally, UMC appeared to have faced increased budget cuts prior to the supposed five-percent-reduction directive from UMC's CEO, the latter of which occurred in approximately July of 2014. (*See, e.g.,* ECF No. 71 at 5-6; *see also* ECF No. 66-10 at 5-6.) If anything, the failure to refill the dayshift RS Supervisor positions and to instead utilize other already salaried employees to perform the duties of the dayshift RS Supervisors suggests that UMC was indeed facing financial problems, that the supervisor position was not an essential position, and that its duties could be absorbed by other more necessary positions. Similarly, Plaintiff's contention that Wiedmann,[31] even with disciplinary issues, was allowed to stay at UMC while Plaintiff was terminated (ECF No. 64 at 19) lends no support to Plaintiff's contention that her termination was retaliatory; there is no evidence that had Plaintiff applied to another position such as an ARCP at UMC that she would not have gotten it and there is no evidence—other than inadmissible hearsay and Plaintiff's speculation—that Wiedmann knew the supervisor position was going to be eliminated prior to applying to the ARCP position.

Finally, Plaintiff asserts as evidence of pretext that the position of another individual, Charles Cory, was "listed as being recommended for elimination" during the

---

[31]Any evidence offered about Wiedmann's supposed misconduct or behavior towards Plaintiff is on its own irrelevant because Wiedmann was not in a position to terminate Plaintiff.

layoffs but that he was not actually terminated. (*See* ECF No. 64 at 21 (stating Cory left his employment with UMC a year after the layoffs).) This, however, highlights a key albeit overlooked fact—no evidence is presented that Jones was the ultimate decision maker of what positions would *actually* be eliminated as a result of the budget cut directive from UMC's CEO. (*See, e.g.*, ECF No. 66-10 at 6 (UMC's designated representative stating that the Chief Operating Officer approved certain budget cuts in the RS Department).) To the extent Plaintiff points out that there are inconsistencies in deposition testimony about whether the CEO's directive required either a five percent or a ten percent budget cut for the RS Department (*see* ECF No. 64 at 9-10), this factual dispute does not undermine the credibility of Defendant's proffered reason for eliminating the RS Supervisor position altogether. Even if Jones and the two others in management made recommendations above the CEO's directive of five percent (*see* ECF No. 64 at 9-10; *see also* ECF No. 66-11 at 4), Plaintiff has not offered evidence that UMC actually approved all of the recommendations made to it for the RS Department, or that, even if UMC did approve all recommendations to cut expenses in the Department, this was somehow an illegitimate business decision suggesting Plaintiff's termination was retaliatory. Cutting a budget beyond a directive is not itself evidence of pretext nor does it suggest pretext without the existence of other circumstantial evidence to buttress it.

For all these reasons, the Court finds Plaintiff has failed to introduce specific and substantial evidence of pretext to give rise to a triable issue of material fact. Therefore, the Court grants summary judgment in favor of Defendant as to Plaintiff's retaliation claims.

**VI.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of Defendant's Motion.

///

It is therefore ordered that Defendant's Motion for Summary Judgment (ECF No. 54) is granted. Given that Defendant made arguments regarding Plaintiff's purported hostile work environment claims in its reply (*see* ECF No. 74 at 17-19), the Court gives Defendant leave to file a renewed motion for summary judgment based solely on those claims. That motion for summary judgment must be filed within thirty (30) days of this order. The parties will then follow the normal briefing schedule.

DATED THIS 26th day of March 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE